IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs March 18, 2020

**STATE OF TENNESSEE v. DALE RICHARD BIBLE**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-D-2677      Steve R. Dozier, Judge**

_____

**No. M2018-01615-CCA-R3-CD**

_____

The Defendant, Dale Richard Bible, was convicted by a jury of criminally negligent homicide and child neglect, for which he received consecutive sentences of six and four years, respectively. See Tenn. Code Ann. §§ 39-13-212, -15-401. On appeal, the Defendant argues that his dual convictions violate double jeopardy. After our review, we reverse the judgments of the trial court and remand the case for entry of corrected judgments reflecting the merger of the Defendant's adjudications of guilt into a single conviction for criminally negligent homicide.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Jay A. Umerley (on appeal), and Mark Kovach (at trial), Nashville, Tennessee, for the appellant, Dale Richard Bible.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jeffery George and Tammy Meade, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This appeal stems from the death of the Defendant's four-month-old daughter ("the victim"). On November 27, 2017, the Defendant and his wife,[1] Rachel Danielle Jarrett

_____

[1] There is some unclarity as to whether the couple was actually married or if they just held themselves out as a married couple.

("the co-defendant"), were indicted on charges related to the victim's death.[2]  Specifically, in count one, the Defendant was charged with felony murder of the victim during the perpetration or attempt to perpetrate aggravated child neglect on September 20, 2015.  See Tenn. Code Ann. § 39-13-202.  In count two, the Defendant was charged with aggravated child neglect: that between September 16, 2015, and September 20, 2015, "the Defendant knowingly did neglect [the victim], a child eight (8) years of age or less so as to adversely affect the child's health and welfare, and the act of neglect resulted in serious bodily injury to the child[.]"  See Tenn. Code Ann. § 39-15-402.

The Defendant and the co-defendant were tried jointly in June 2018.  At trial, the State presented the following proof.

On April 22, 2015, the victim was born prematurely at twenty-nine weeks, weighing two pounds, ten ounces.  At birth, babies are given an APGAR score, which "assign[s] grades to babies . . . based on heart rate, and movement and tone, and kind of over all the general baby's appearance" at one, five, and ten minutes after birth; the victim's APGAR score was 1 on those occasions, the lowest possible score.  Though the victim had multiple birth defects, after four months of receiving care in the Neonatal Intensive Care Unit ("NICU") of Vanderbilt Children's Hospital ("VCH"), including several surgeries, she had improved significantly and was released on September 16, 2015, into the care of her parents, the defendants.  At the time of her discharge, the victim weighed eight pounds and five ounces.  Her doctors believed that it was possible for the victim to live and grow to adulthood, despite her medical conditions.  However, the victim died four days later, on September 20, 2015, at home in her parents' bed.

Relative to the victim's specific medical conditions, she suffered from "heterotaxy syndrome," meaning several of the victim's internal organs were in the wrong locations.  The victim had congenital heart disease and faced heart surgery once she had grown more, but at the time of her discharge from the hospital, her doctor was pleased with the progression of her heart condition.  The victim also had "bronchopulmonary dysplasia . . . a form of chronic lung disease . . . typically seen in an extremely low-birth weight infant."  However, the victim's doctor said that babies born at the victim's birth weight had "a pretty decent chance for survival" and that she was expected to recover from the chronic lung disease.

Nonetheless, the victim's doctor said that babies with chronic lung disease and bronchopulmonary dysplasia often required supplemental oxygen, so that they had the oxygenation they needed for their lungs and other organs.  In the victim's case, the supplemental oxygen provided to her made it easier for oxygen to get into her lungs.  Her doctors believed that eventually, the victim's lung function would improve to the point that

---

[2] This was a second and superseding indictment.

- 2 -

she would no longer need supplemental oxygen, though she needed supplemental oxygen to survive at the time of her release from the hospital. In addition, while in VCH, the victim's oxygen saturation levels were measured by a "pulse oximeter machine" that was attached to her. The machine alerted the medical staff if the victim was not receiving the desired amount of oxygen. To help the victim breathe, she was sent home with an oxygen breathing tube or nasal cannula and a pulse oximeter machine.

Before being discharged, the defendants received training on the home equipment. In addition, VHC staff taught the couple about creating a safe home environment for the victim. The training included lessons on home safety, "safe sleep," and the effects of secondhand smoke. The teaching was continuous during the victim's stay in the hospital. The victim's medical records were replete with instances of teaching and training on these matters, evidenced in the discharge summary, the family teaching assessment record, and the "Safe Sleep Information Form," which was signed by the Defendant on September 14, 2015.

Dr. Shannon Walker, a resident physician at VCH and expert in pediatrics, provided care to the victim while she was in the NICU. Dr. Walker was scheduled to be the victim's primary care pediatrician following the victim's release from the hospital. Dr. Walker testified that, generally, parents were advised regarding the recommendations of the American Academy of Pediatrics Safe Sleep Guidelines, which stated that the baby should "sleep alone, on their back, and in a crib, so that they [were] by themselves in a safe environment." Dr. Walker confirmed that "risk factors that [were] correlated with unsafe sleep deaths" included low-birth weight babies, soft bedding, secondhand smoke, sleeping in an adult-sized bed, and sleeping with a parent. Dr. Walker indicated that this risk was increased if the parents were taking illicit or sedation causing drugs.

Relative to the victim, Dr. Walker stated that if the victim's parents were smoking in the house and were sharing a bed with the victim, this created a "dangerous" situation for her and "could [have] contribute[d] to an asphyxiation event." According to Dr. Walker, the victim's oxygen saturation range at discharge was set between 75 and 90 percent, and the victim's alarm on her pulse oximeter machine would alert if her levels were outside this range. Dr. Walker explained that if a person's oxygen saturation level fell below a certain percentage, it was called "hypoxia." Dr. Walker opined that it would be "very dangerous" if the victim's oxygen level fell below 70 percent for the twenty-four hours before her death and that if it was 60 percent for "almost the entire twelve hours before her death," it could have caused her death.

Dr. Jayant Shenai, a specialist in neonatology at VHC, testified that she also cared for the victim while the victim was in the NICU. In addition, Dr. Shenai testified that when monitoring a baby with the victim's conditions, it would never be appropriate to turn off a pulse oximeter machine for an hour-long period of time or ignore the alarm if oxygen

- 3 -

saturation levels were out of range. She also noted that the pulse oximeter machine monitored the victim's heart rate and would alarm if the victim's heart stopped. Dr. Shenai called an oxygen saturation level of below 60 percent "profoundly low," and she opined that an extended period below 70 and 60 percent would be "dangerous." Dr. Shenai stated that a baby could die if she were hypoxic for too long and did not receive treatment.

Dr. Shenai stated that she would be concerned if the victim "was sleeping in an adult bed with soft bedding, pillows and blankets between her two adult parents." Dr. Shenai explained that a leading cause of sudden infant death syndrome, where a healthy baby died suddenly, was suffocation by being on a soft mattress surrounded by soft bedding. According to Dr. Shenai, a baby like the victim, who already had breathing problems, would be susceptible to suffocation, which would "worsen her chances of being hypoxic." Furthermore, Dr. Shenai confirmed the danger of secondhand smoke, explaining that a baby with lung disease like the victim had "a lung that [was] immature [and] developing and so exposure to even passing smoke would be detrimental to that lung and therefore detrimental to the baby."

Following the victim's release from VHC, she had her first scheduled follow-up visit at the hospital's pediatric clinic on September 18, 2015. On that date, Dr. Lori Tucker checked the victim's oxygen saturation level and found her blood oxygen saturation was 84 percent, within the target range. Dr. Walker further noted that nothing in the record reflected a parent's reporting that the victim's pulse oximeter machine had been malfunctioning.

James Tynen worked at Nonin Medical, the company that made the pulse oximeter 7500, the machine used by the victim. Mr. Tynen stated that the machine generated a different report each time when turned on and off. He tested the machine that had been given to the defendants to monitor the victim and found that it was working properly at the time of the victim's death. He indicated that the "[u]nit alarms and defaults" on the victim's machine were set to an oxygen saturation level between 75 and 90 percent and a heart rate between 80 and 200. Mr. Tynen also observed that someone had placed tape "over the speaker grill" on the victim's machine, which he found unusual as it "muffled" the sound of the alarm.

Gregory Rausch was the vice-president of research and development at Nonin, and he reviewed the thirty-three reports from the victim's machine that had been downloaded by Mr. Tynen. When Mr. Rausch was asked why the machine generated thirty-three reports between the time the victim went home and her death, he said that this could have been caused by removing the power source, including turning the machine off and on, or by a manipulation of the data, but the last would require a skilled technician to perform. Mr. Rausch indicated that the victim's machine was often turned off for hours-long periods of time before being turned back on again, and beginning on September 19, the victim's

oxygen saturation levels were frequently under 75 percent when recorded by the machine, and even below 55 percent on some occasions. Specifically, as relative to close to the time of the victim's death, Mr. Rausch noted that the machine was turned off on September 19 at 8:41 p.m. and was not turned back on until 2:46 a.m. on September 20, a period of six hours and forty-five minutes. At that time, the machine was only turned on for five minutes and thirty-two seconds before being turned back off again. Moreover, no data was collected in this last report before the victim's death; Mr. Rausch believed that the sensor was never placed on the victim when the machine had been turned back on this last time.

In September 2015, Jamie Millar was an intake coordinator for TwelveStone Healthcare, previously Reeves-Sein, and she was responsible for having the oxygen tanks and the pulse oximeter machine delivered for the victim's care. When the machine was delivered to the defendants' home, the delivery driver reviewed a safety checklist with the recipient, and this information included a warning that "[s]moking is prohibited in areas where oxygen is in use." The delivery document was signed by the co-defendant. According to Millar, nothing in the records indicated a parent's ever calling to report to Reeves-Sein that the victim's machine was malfunctioning.

Kelly Bordenet, a registered nurse, taught laypeople how to use the medical equipment leased out by Reeves-Sein, where she worked in September 2015. Nurse Bordent indicated that the alarm of the victim's pulse oximeter machine was "pretty loud." Nurse Bordenet testified that she emphasized with clients the importance of calling 911 if the baby was in distress or did not "look right." Nurse Bordenet confirmed that she taught the Defendant how to use the victim's pulse oximeter machine while the victim was still in the NICU at VCH hospital. Tracy Stembridge, an on-site care coordinator for TwelveStone, testified that she returned to VCH the next day to go over the information again with both parents.

On the morning of September 20, 2015, the co-defendant called 911 at 7:46 a.m. to ask for help with a medical emergency. The 911 call was played for the jury. Officer Joshua Borum with the Metro Nashville Police Department ("MNPD") responded to the call and was first on the scene. He described that when he approached, the apartment was "dark and filled with cigarette smoke," and the further he went inside, it got worse, making it hard for him to breathe. The Defendant and co-defendant were both present; they ushered Officer Borum inside and told him that the victim was not breathing. Upon entering the bedroom, Officer Borum saw cigarettes on the dresser and an ashtray on the bed. Officer Borum found the victim on the bed and checked for a pulse, but he found none. He also noticed that the victim's oxygen nasal cannula was not in her nose, so he hooked her back up to the oxygen. He performed CPR on the victim until the paramedics arrived.

Paramedic and firefighter Douglas Pardue arrived on the scene and took over performing CPR on the victim. Mr. Pardue said that "[u]pon entering the apartment, the

smell was horrific" due to a "strong odor of smoke." Mr. Pardue recalled that the Defendant told him that he discovered the victim in this condition, his last laying eyes on her fifteen or twenty minutes earlier. Mr. Pardue was never able to revive the victim. When Mr. Pardue got the victim outside and placed her in the ambulance, she was "mottled" and blue, and her chin and fingers were rigid. They could not intubate the victim due to her jaw being very rigid, making them unable to successfully open her mouth. The victim was later pronounced dead at Skyline hospital at 8:26 a.m.

MNPD Detective Sarah Bruner met separately with the Defendant and co-defendant at Skyline on September 20, 2015, and a recording of each interview was played for the jury. In the Defendant's interview, he said that the victim became "fussy" during the evening hours of September 19, 2015; he later went to Walgreens to get Children's Tylenol believing something was not quite right with the victim. According to the Defendant, the Tylenol helped calm the victim, and she went to sleep in their bed, rather than as usual in her car seat, so that they could monitor her. The Defendant claimed that the pulse oximeter machine was on and working when they went to sleep. Though the victim woke up several times during the evening, she went back to sleep after the defendants' comforted her; the Defendant said that the victim's oxygen saturation level and heart rate were fine on those occasions. The Defendant said that the next morning, he awoke to the co-defendant's screaming that the victim was not breathing; he began CPR; and the co-defendant phoned 911. The Defendant also admitted to using the drug suboxone the evening prior to the victim's death, although he said he only used half a strip; he claimed that he had a low tolerance for the drug.

After the interviews, Detective Bruner went to the defendants' home, which she described as very dark, dirty, and smelling of smoke. Once inside, Detective Bruner observed filled ashtrays and cigarettes in multiple rooms. She also saw that there was a baby crib but that it was completely packed with other items. The pulse oximeter machine was on the defendants' bed, and Detective Bruner observed a strip of tape over the place where the alarm would sound. The pulse oximeter machine was admitted into evidence. According to Detective Bruner, the tape on the machine did not completely muffle the sound of the alarm. Also, videos of the scene, in which the defendants reenacted what happened in the hours leading up to the victim's death, were played for the jury.

Detective Bruner reviewed the photographs of the scene, including those that showed a blanket and three pillows on the bed and a burn on the sheet. The photographs also reflected that the pulse oximeter machine was placed on the bed next to an ashtray containing smoked and partially-smoked cigarettes; that the ashtray on the bed was also close to the victim's oxygen tank, which was on the floor next to the bed; that a pack of cigarettes, along with a partially-smoked cigarette, was on the nightstand table next to the bed; and that a trash can in the bedroom contained smoked cigarettes. The photographs

also showed additional cigarettes, ashtrays, and smoking paraphernalia, as well as multiple syringes, throughout the apartment.

A Walgreens receipt found in the trash can reflected that a purchase was made at 2:09 a.m. on September 20, 2015, for infant Tylenol. In addition, Detective Bruner found a bottle of suboxone prescribed to the co-defendant that had been filled on September 14, 2015, for fifty-six strips to be taken twice daily; however, on September 20, 2015, the bottle contained only four and one-half strips, meaning that thirty-eight and one-half strips had been used in a six-day period. Detective Bruner also located two prescription bottles of gabapentin—one bottle had been prescribed on August 17, 2015, for 120 pills, but the bottle was empty; and the second bottle, filled September 10, 2015, had nine pills inside. Investigators found another thirty-seven gabapentin pills of a different milligram strength in a bottle marked for a different prescription.

Dr. Erin Carney testified that she was a forensic pathologist for the Davidson County Medical Examiner's Office and that she performed the victim's autopsy. Although Dr. Carney could not conclusively determine the victim's cause or manner of death, she stated in the autopsy report, "A scene investigation is concerning for possible overlay and an asphyxial cause of death [could not] be ruled out." She also noted in the report that the victim was "unresponsive in an unsafe sleep environment consisting of an adult bed and co-sleeping with two adults." Dr. Carney explained that an asphyxial cause of death meant that "for whatever reason, there is not enough oxygen to those vital organs, the brain, the heart, the lungs, so you die of a lack of oxygen"; however, there was often "not good evidence of what exactly happened" in these situations. Relative to other possible causes, Dr. Carney opined, "I was certainly worried that this abnormal heart put her at risk for an abnormal heart rhythm that wouldn't sustain life. So that heart disease, the abnormal heart could be a cause of death." Because of these competing causes, Dr. Carney could not say for certain what caused the victim's death.

Dr. Carney stated that though it could be difficult to determine a cause of death, a "scene investigation" could often provide important information in this regard; in cases like this, an investigator from the medical examiner's office went to the scene with the police and talked to caregivers, found out in what condition the victim was discovered, and took photographs. After reviewing the report and photographs generated by an investigator with the medical examiner's office in regards to the victim's case, Dr. Carney was concerned about asphyxia because the victim was sleeping in a soft, adult-sized bed with two adults and because of the large wet area seen on the bed. Dr. Carney explained,

> [T]here is an area that is wet on the bed and it's rather large, so she is leaking around that feeding tube. And if there is some pressure on her that's causing increased leaking, . . . somebody has rolled over on her or an arm on her or

something, then . . . it could be that she may have had some asphyxial death due to some sort of overlay, like an arm on her or . . . pushed up against her.

Also of concern to Dr. Carney, the investigative report noted that "a nasal cannula was . . . on the bed adjacent to an ashtray with cigarette butts and [that] there were cigarette burns" in the bed sheet. Dr. Carney agreed that exposure to cigarette smoke could cause a child with the victim's lung problems to have "a hard time oxygenating at baseline" and "put her at risk for asphyxia."

Penny Pinegar testified that she was a friend of the defendants and that she used to give them rides to the hospital to see the victim while the victim was in the NICU. Ms. Pinegar testified that she visited the home once after the baby came home and that she found "smoking in the house." Ms. Pinegar also testified that the co-defendant relayed to her that the alarm on the victim's pulse oximeter machine was very loud and frequently alerted and that "she couldn't handle" the noise. The co-defendant admitted to Ms. Pinegar that she unplugged the victim's pulse oximeter machine several times. In addition, the co-defendant was "also shooting up [s]uboxone" at the time of the victim's death, according to Ms. Pinegar.

Pharmacist Reggie Dillard, the executive director to the Tennessee Board of Pharmacy, testified that suboxone was a combination drug, with an opioid component. According to Mr. Dillard, side effects of suboxone included lethargy, drowsiness, and occasional euphoria; a typical prescribed dose was eight to sixteen milligrams a day and was to be taken orally; and the side effects were increased if taken in a higher dose than prescribed. Moreover, injecting suboxone likewise increased the drug's effects. Mr. Dillard testified that gabapentin was a prescription medicine prescribed for seizures or neuropathy pain, that a normal dose was between 1,200 to 1,800 milligrams per day, and that it also caused drowsiness and lethargy and had a euphoric effect. According to Mr. Dillard, effects of gabapentin were sometimes more intense if used in combination with suboxone.

During closing argument, the prosecutor first addressed the charged offense of aggravated child neglect, focusing initially on how the defendants knowingly neglected the victim. The prosecutor cited unsafe sleeping conditions, including the defendants' using intoxicating substances that caused drowsiness or lethargy and that made it more likely one of them would roll over on or press up against the victim and cause asphyxiation; smoking around the victim with a known lung condition; turning off and manipulating the pulse oximeter machine; and failing to seek medical care for the victim when her oxygen was below acceptable limits. The prosecutor reminded the jury that during jury selection, they discussed "that the crime of child neglect is a continuing offense." The prosecutor continued, "It's everything that they did. It's also omissions and commissions. . . . I am saying that they did it over the course of hours for the entire day leading up to when [the

victim] died. This is hours and they did nothing." The prosecutor described the defendants' actions as "sustained neglect." The prosecutor then discussed the element of serious bodily injury for the neglect offense, citing hypoxia as the adverse effect to the victim's welfare due to the defendants' neglect that resulted in a substantial risk of death.

Relative to the felony murder offense, the prosecutor indicated that the State had proven that the killing was committed in the perpetration or attempt to perpetrate aggravated child neglect. The prosecutor observed that the State was not required to establish that the defendants intended for the victim to die from their actions, but only had to show that the defendants intended "to not call the doctor," to "unplug the machine," and to smoke around the victim. The prosecutor further maintained that though the medical examiner could not say for certain, the evidence supported a finding that the victim died of asphyxia, meaning that the victim's body shut down because it was deprived of oxygen for too long. The prosecutor noted the presence of multiple risk factors of asphyxia, "including the blankets and pillows, cigarette smoke, the sleeping with adults and the low birth weight." The prosecutor surmised,

> [The victim] died because her body ran out of oxygen which was the direct result of the [defendants'] neglect. I[f] they had gotten her help, she could have been brought back into normal oxygen levels. If her machine had been on the moment she died, they could have intervened sooner.

Defense counsel in closing argument [3] responded that the State's "best guess" as to the victim's cause of death was asphyxia, and he noted that the medical examiner would not state for certain that the victim's death was a homicide. Defense counsel observed, "[W]hat this whole case is about, it has been about what could happen, what's possible, there was a risk created." Defense counsel stated that the State was required to prove the "actual impact of harm" from the defendants' neglect, not just "a risk of harm," and noted that the State had referenced the multiple different alleged neglectful actions of the defendants, including smoking and the condition of the victim's crib.

In rebuttal, the prosecutor stated that finding the defendants guilty of the aggravated child neglect part was "the easy part," reasoning to the jury,

> [Y]ou only have to find[] that they caused her to be hypoxic, that they could have intervened but they didn't and they caused her to be more hypoxic or hypoxic for longer. And that by being hypoxic for [the victim] involved a substantial risk of death. You don't have to find that they caused her death for the aggravated child neglect part.

---

[3] The co-defendant's attorney also gave a closing statement, which we will not detail herein.

The prosecutor continued by noting that the victim was breathing well at Dr. Tucker's office on September 18, 2015, and noted that it was once the victim returned home from that appointment that she began to decline. The prosecutor then observed,

> It's only when she went back to her home filled with smoke and in a dangerous condition. It's only when her parents had friends over on Saturday night and started doing drugs and smoking and started turning off her machine that she stops breathing well. You can see when it happens. It starts happening on the day Saturday and into the night. They turn it off more and more and more until she dies in the early morning hours of Sunday.

Following the conclusion of proof and arguments, the Defendant was convicted of the lesser-included offenses of criminally negligent homicide in count one and child neglect in count two; both Class E felonies. See Tenn. Code Ann. §§ 39-13-212, -15-401. At the subsequent sentencing hearing, the Defendant argued that double jeopardy principles required merger of his convictions; specifically, he argued that the convictions arose from the same conduct and that the crimes shared common elements. In response to the merger claim, the State argued that the crimes do not merge because the statutes are not intended to punish the same act and because the crimes do not share common elements. According to the State, the victim suffered for three days from low oxygen, which consisted the basis for the neglect offense, and that her dying from asphyxia was a separate action, which constituted the homicide offense. The trial court declined to merge the offenses.

Thereafter, the trial court imposed Range III, persistent offender sentences of six years for criminally negligent homicide and four years for child neglect. Those sentences were ordered to be served consecutively, for a total effective sentence of ten years. After denial of the Defendant's timely motion for new trial, this appeal followed.

ANALYSIS

The Defendant argues that his convictions for child neglect and criminally negligent homicide violate the state and federal prohibitions against double jeopardy. The Defendant asserts that he received multiple punishments for the same offense. The State disagrees.

Both the United States and Tennessee Constitutions protect against a criminal defendant being placed in double jeopardy for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. This protection includes: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). At issue here is the last of these protections, protection against multiple punishments for the same offense, specifically, a "multiple description claim." A claim that multiple convictions violate the

protection against double jeopardy is a mixed question of law and fact, which this court will review de novo without any presumption of correctness. State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014) (citing State v. Thompson, 285 S.W. 3d 840, 846 (Tenn. 2009)).

Multiple description claims "arise in cases in which defendants who have been convicted of multiple criminal offenses under different statutes allege that the convictions violate double jeopardy because the statutes punish the 'same offense.'" Watkins, 362 S.W.3d at 544. As such, we are tasked with determining whether the Defendant committed multiple offenses or only one. Id. In doing so, we apply the test announced in Blockburger v. United States, 284 U.S. 299 (1932). See also Watkins, 361 S.W.3d at 556 (adopting the Blockburger test).

The Blockburger test provides that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304. The central analysis of the Blockburger test "requires an examination of the statutory elements [of the offenses] in the abstract, without regard to the proof offered at trial in support of the offenses." Watkins, 362 S.W.3d at 544. "If each offense includes an element that the other offense does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." Id. (quoting Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)) (internal quotation marks omitted).

The first step in the Blockburger test is to determine the threshold question of "whether the convictions arise from the same act or transaction." Watkins, 362 S.W.3d at 556. "If the convictions do not arise from the same act or transaction, there cannot be a violation of the double jeopardy protection against multiple punishment." Id. In answering this question, we refer "to the charging instrument and the relevant statutory provisions" and "consider whether the charges arise from discrete acts or involve multiple victims." Id. The second step of the Blockburger test requires us "to examine the statutory elements of the offenses." Watkins, 362 S.W.3d at 557. The following presumptions apply to our examination of the statutory elements of the offenses:

> If the elements of the offenses are the same, or one offense is a lesser-included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

Id. (internal footnote omitted).

A person commits child neglect when that person "knowingly . . . neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare[.]" Tenn. Code Ann. § 39-15-401(b). If the victim is under the age of eight years old, child neglect is a Class E felony. Tenn. Code Ann. § 39-15-402(b). In short, child neglect is composed of three essential elements: "(1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." State v. Sherman, 266 S.W.3d 395, 404 (Tenn. 2008). Criminally negligent homicide is defined as "criminally negligent conduct that results in death"; it is a Class E felony. Tenn. Code Ann. § 39-13-212. The mens rea for criminally negligent homicide is defined in Code section 39-11-302(d): "criminal negligence" requires "a substantial and unjustifiable risk" and the risk must be of such a nature and degree that "the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the person's standpoint."

Here, the trial court applied the two-step test outlined in Blockburger and declined to merge the Defendant's convictions for criminally negligent homicide and child neglect. First, the trial court determined that the conduct giving rise to the offenses resulted from the same act or transaction, that being the Defendant's neglect: "Although the evidence presented at trial suggested that [the victim] suffered from low oxygen levels for several days before her death, the [c]ourt is of the opinion that both of those injuries and [the victim's] ultimate death were caused by the Defendant's neglect." We agree that the Defendant's convictions for criminally negligent homicide and child neglect arose from the same act or transaction.

There was only one victim, and the indictment did not reference any specific or discrete acts for the separate counts. In addition, the offenses occurred in the same location, in close temporal proximity, and as part of a continuing criminal transaction. And though the felony murder count charged a date of only September 20, 2015, whereas the aggravated child neglect count charged dates between September 16 through September 20, 2015, the State argued that it was the Defendant's entire course of neglectful conduct in the days leading up to September 20—the smoking, having the child in bed with the couple, and turning off the pulse oximeter machine, that resulted in the victim's low oxygen saturation levels, and ultimately her death. Moreover, the forensic pathologist could not conclusively name the cause of death or determine the manner of death.

We also believe that the prosecutor's closing argument at trial as cited above supports this conclusion that the State was relying on the defendants' entire course of conduct in the days leading up to the victim's death to establish the offenses of aggravated child neglect and felony murder. The evidence presented at trial and the arguments made do not support the State's theory on appeal that "the jury was faced with an argument and

evidence of two different crimes," those being turning off the machine for the murder offense and the smoking and unsafe sleeping conditions for the neglect offense. Therefore, the Defendant's double jeopardy claim survives our threshold inquiry, "meaning the potential for a double jeopardy violation exists in this case," see Watkins, 362 S.W.3d at 558, and we move to the next step of the Blockburger test. See also State v. Devin Jay Davis, No. W2012-02195-CCA-R3-CD, 2014 WL 1600935, at *11 (Tenn. Crim. App. Apr. 21, 2014); State v. Dwaniko Martez Sudberry, No. M2011-00432-CCA-R3-CD, 2012 WL 5544611, at *17 (Tenn. Crim. App. Nov. 14, 2012).

Proceeding to the second step of Blockburger, the trial court, examining the statutory elements of the offenses, correctly found "that the offenses of criminally negligent homicide and child neglect each contain a different element not contained in the other offense"; the trial court reasoned that "[c]riminally negligent homicide requires a killing, while child neglect does not," and that "child neglect requires proof that the victim was under a certain age, while criminally negligent homicide has no[] such element." The trial court then concluded, "Thus, neither offense is a lesser-included offense of the other, and the Defendant's convictions for each offense do not run afoul of the double jeopardy provisions of the state or federal constitutions." On this second point we disagree with the trial court's conclusion.

We observe that this court has previously held that separate convictions for aggravated child abuse and criminally negligent homicide do not violate the prohibition against double jeopardy. See Davis, 2014 WL 1600935, at *11-12. In so concluding, this court provided a similar rationale to that of the trial court in this case, stating as follows:

> Criminally negligent homicide requires proof of a killing; aggravated child abuse does not. Aggravated child abuse requires proof that the victim was a "child," that is, a person less than eighteen years of age; criminally negligent homicide has no age-based requirement. Each offense includes an element not contained in the other and, therefore, are not the "same offense" for purposes of double jeopardy. See Watkins, 362 S.W.3d at 558 (concluding that aggravated child abuse and reckless homicide are not the "same offense" for purposes of double jeopardy). Additionally, neither offense is a lesser-included of the other. See State v. Godsey, 60 S.W.3d 759, 778 [(Tenn. 2001)] (noting that the Legislature specifically designated child abuse, but not aggravated child abuse, a lesser-included offense of homicide).

Id. at *12.

As noted in Davis, the Godsey court observed that the Legislature specifically designated child abuse and neglect, but not aggravated child abuse and neglect, a lesser-

- 13 -

included offense of homicide. Unlike the court in <u>Davis</u>, dual convictions for criminally negligent homicide and child neglect are precisely what we are presented with here.

Subsection (f)[4] of the child abuse and neglect statute, Tennessee Code Annotated section 39-15-401, provides, "A violation of this section may be a lesser included offense of any kind of homicide, statutory assault, or sexual offense, if the victim is a child and the evidence supports a charge under this section." Thus, the Legislature has in fact declared child neglect a lesser-included offense of criminally negligent homicide. Accordingly, we will presume that multiple convictions were not intended by the Legislature under the facts presented here and that multiple convictions violate double jeopardy. <u>See</u> <u>Watkins</u>, 362 at S.W.3d at 557 (specifically citing Code section 39-15-401 as authority for its point).

CONCLUSION

Therefore, we reverse the judgments of the trial court and remand to the trial court to reflect proper merger of the child neglect offense into the criminally negligent offense. The Defendant's effective sentence will thereby be reduced to six years. The case is remanded to the trial court for entry of corrected judgments of conviction consistent with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE

---

[4] <u>Godsey,</u> a 2001 case, addressed a prior version of the statute, and this provision was found in subsection (d) at that time. Since 2001, this subsection has been redesignated as (f).